# Supreme Court of Florida

_____

No. SC17-1501
_____

**PERRY ALEXANDER TAYLOR,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 3, 2018]

PER CURIAM.

Perry Alexander Taylor, a prisoner under a sentence of death, appeals an order denying his successive motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the denial of relief.

## FACTS AND RELEVANT PROCEDURAL HISTORY

The facts of this case were described on direct appeal as follows:

Taylor was charged with the murder and sexual battery of Geraldine Birch whose severely beaten body was found in a dugout at

a little league baseball field.[1] Shoe prints matching Taylor's shoes were found at the scene. Taylor confessed to killing Birch but claimed that the sexual contact was consensual and that the beating from which she died was done in a rage without premeditation. Taylor testified that on the night of the killing, he was standing with a small group of people when Birch walked up. She talked briefly with others in the group and then all but Taylor and a friend walked off. Taylor testified that as he began to walk away, Birch called to him and told him she was trying to get to Sulphur Springs. He told her he did not have a car. She then offered sex in exchange for cocaine and money. Taylor agreed to give her ten dollars in exchange for sex, and the two of them went to the dugout.

Taylor testified that when he and Birch reached the dugout they attempted to have vaginal intercourse for less than a minute. She ended the attempt at intercourse and began performing oral sex on him. According to Taylor, he complained that her teeth were irritating him and attempted to pull away. She bit down on his penis. He choked her in an attempt to get her to release him. After he succeeded in getting her to release her bite, he struck and kicked her several times in anger.

*Taylor v. State* (*Taylor I*), 583 So. 2d 323, 325 (Fla. 1991) (footnote omitted).

During the trial, Dr. Lee Miller, the associate medical examiner of Hillsborough County, testified that Birch died of massive blunt force injuries to the head, neck, chest, and abdomen. Dr. Miller offered the following testimony with respect to Birch's genital injuries:

> STATE: Do you have an opinion within a reasonable degree of medical probability as to what caused the injuries to the interior of the vagina . . . ?
> DR. MILLER: Yes.

---

1. Taylor was charged with both premeditated murder and felony murder with the underlying felony of sexual battery. *Taylor v. State*, 583 So. 2d 323, 328 (Fla. 1991).

STATE:  What would be that opinion?

DR. MILLER:  Something was inserted into the vagina which stretched the vagina enough for it to tear over the object that was inserted in there.

STATE:  Do you have an opinion within a reasonable degree of medical probability that object could have been a hand?

DR. MILLER:  Yes.

STATE:  Could it have been some other type of object other than a penis?

DR. MILLER:  Yes.

STATE:  Is it your opinion within a reasonable degree of medical probability that a penis inserted into the vagina could have caused the injuries you just described?

DR. MILLER:  No.

Dr. Miller later testified:

STATE:  The injury you observed to the exterior of the vagina, within a reasonable degree of medical probability is that consistent with having been inflicted by someone kicking her to that area?

DR. MILLER:  No.

STATE:  *The injuries you observed to the interior of the vagina, are those injuries within a reasonable degree of medical probability consistent with having been inflicted by someone kicking her in that area?*

DR. MILLER:  *No.*

STATE:  Within a reasonable degree of medical probability would penetration have been necessary to inflict the injuries to the interior of the vagina?

DR. MILLER:  Yes.

(Emphasis added.)

The jury convicted Taylor of both first-degree murder and sexual battery with great force.  The jury recommended death by a vote of twelve to zero, and the trial court sentenced Taylor to death.  *Taylor I*, 583 So. 2d at 325.  On direct appeal, this Court affirmed Taylor's convictions, but reversed the death sentence

and remanded for a new penalty phase. *Id.* at 330. Of relevance to this case was Taylor's guilt-phase challenge to the trial court's denial of his motion for judgment of acquittal with respect to the charge of felony murder. *Id.* at 328. Taylor argued the evidence was legally insufficient to prove lack of consent with respect to the charge of sexual battery. *Id.* In rejecting this claim, we stated:

> [E]ven accepting Taylor's assertion that the victim initially agreed to have sex with him, the medical examiner's testimony contradicted Taylor's version of what happened in the dugout. According to Taylor, he had vaginal intercourse with the victim for less than a minute without full penetration. He testified that she then indicated that she did not want to have intercourse and began performing oral sex on him. The medical examiner testified that the extensive injuries to the interior and exterior of the victim's vagina were caused by a hand or object other than a penis inserted into the vagina. Given the evidence conflicting with Taylor's version of events, the jury reasonably could have rejected his testimony as untruthful.

*Id.* at 329.[2] After a second penalty phase, the jury recommended a sentence of death by a vote of eight to four, and the trial court followed that recommendation.

---

2. We also concluded that the trial court did not err in denying the motion for judgment of acquittal on the charge of premeditated murder:

> [T]he jury reasonably could have rejected as untruthful Taylor's testimony that he beat the victim in a rage after she injured him. Although Taylor claimed that the victim bit his penis, an examination did not reveal injuries consistent with a bite. According to Taylor, even after he sufficiently incapacitated the victim by choking her so that she released her bite on him, he continued to beat and kick her. The medical examiner testified that the victim sustained a minimum of ten massive blows to her head, neck, chest, and abdomen. Virtually all of her internal organs were damaged. Her brain was bleeding. Her larynx was fractured. Her heart was torn. Her liver was reduced to

- 4 -

*Taylor v. State* (*Taylor II*), 638 So. 2d 30, 31-32 (Fla.), *cert. denied*, 513 U.S. 1003 (1994).  On appeal, we rejected all of Taylor's claims and affirmed the sentence of death.  *Id.* at 33.

In his initial motion for postconviction relief, Taylor raised twenty-one claims, all of which were denied.  *See Taylor v. State* (*Taylor III*), 3 So. 3d 986, 991 & n.1 (Fla. 2009).  This Court affirmed the denial of postconviction relief and also denied Taylor's petition for writ of habeas corpus.  *Id.* at 1000.  Of relevance to this case was Taylor's claim that Dr. Miller had recanted his trial testimony with respect to Birch's genital injuries.  *Id.* at 992.  This Court described the testimony offered during the evidentiary hearing as follows:

> Dr. Miller testified that the injuries sustained were mostly confined to the labia minora and radiated inward, while some were inside the labia minora in "what anyone would describe as the vaginal canal." However, Dr. Miller further testified that the injuries could possibly have been the result of a kick if the blow had been struck where the toe of the shoe actually went into the vagina, stretching it, that any shoe would have been able to penetrate the victim's vagina due to extraversion, but that ultimately the injuries were caused by stretching and not direct impact.  *Miller testified that the possibility of a kick*

> pulp.  Her kidneys and intestines were torn from their attachments. Her lungs were bruised and torn.  Nearly all of the ribs on both sides were broken.  Her spleen was torn.  She had a bite mark on her arm and patches of her hair were torn off.  Her face, chest, and stomach were scraped and bruised.  Although Taylor denied dragging the victim, evidence showed that she had been dragged from one end of the dugout to the other.  The evidence was sufficient to submit the question of premeditation to the jury.

*Taylor I*, 583 So. 2d at 329.

- 5 -

*causing the injury was "a one in a million shot" and that his opinions as expressed at trial had not changed.* He attributed any differences in his testimony to differences in the questions being asked and, in some instances more elaboration in exploring possibilities.

*Id.* (emphasis added). The actual dialogue from the evidentiary hearing was:

> DR. MILLER: [Defense postconviction expert] Dr. Wright said that the injuries to the inside of the vagina were sustained— probably sustained by a kick or a blow. Whereas, I had said they were sustained by a stretch injury. When he went on to say—to talk about that, he said, well, the blow would have had to have been with the toe of the shoe actually going directly into the vagina which would produce a stretch injury as well, as well as something being gently inserted in there. And I agree with that. I agree that if a blow had been struck where the toe of the shoe actually went, went into the vagina stretching the vagina it would have introduced the injuries that I've described.
> So it would be sort of like inserting an object. Although we certainly didn't—I did not describe originally the inserting of an object and the attorneys didn't bring it out that it could have been a hard blow from a shoe going directly in. That didn't come up and it certainly seems a reasonable possibility, maybe even a probability, in reading Dr. Wright's testimony.
> DEFENSE: So your testimony today would be that the injury to the ten radial lacerations in the labia minora to a reasonable degree of medical probability are the result of a kick?
> DR. MILLER: I'm saying that they could have been the result of a kick. One of many scenarios where something went in there that was wider than the vagina and stretched it. We talked about kicks and blows earlier on. But the subject of the shoe or the foot actually entering the vaginal canal didn't come up. That was—*it's a one-in-a-million shot.*
> DEFENSE: What do you mean a one-in-a-million shot?
> DR. MILLER: Well, it's you can kick somebody an awful lot in that area and not have your toe actually go up into that narrow vaginal canal.

(Emphasis added.)  During cross-examination, Dr. Miller stated his opinion had not changed that Birch's internal genital injuries were caused by penetration by an object "large enough to stretch enough to produce those tears," but he did not know what the object was.

The postconviction court found that Taylor's assertion of a "supposed recantation" by Dr. Miller of his trial testimony was "not an accurate statement of [Dr. Miller's] testimony" and, therefore, Taylor had not demonstrated the existence of newly discovered evidence of innocence of sexual battery.  *Taylor III*, 3 So. 3d at 993 (alteration in original).  In affirming the denial of this claim, we stated:

> In essence, the postconviction court concluded that, at trial, Dr. Miller testified that the lacerations were not, within reasonable medical probability, caused by a kick.  Similarly, at the evidentiary hearing, *Dr. Miller testified that it was his opinion that there was only a one-in-a-million chance that the lacerations could have been caused by a kick.*  Hence, because the record refutes Taylor's contrary interpretation of the testimony, Taylor fails to show that Miller's postconviction testimony qualifies as newly discovered evidence.  While it is true that Miller's trial testimony did not admit to this one-in-a-million possibility, we find this omission insufficient to overturn the trial court's conclusion that sufficient "new evidence" had not been established.

*Id.* at 993 (emphasis added).  We also rejected Taylor's *Brady*/*Giglio*[3] claims.  3 So. 3d at 994-95.  Because Dr. Miller's testimony did not materially change, we

---

3.  *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

- 7 -

affirmed the postconviction court's determination that false testimony was not presented during Taylor's trial, *id.* at 994, and "there is nothing the State has been demonstrated to have suppressed." *Id.* at 995. Additionally, we determined that trial counsel was not ineffective for failing to elicit Dr. Miller's "one-in-a-million" testimony. *Id.* at 996.

Thereafter, Taylor filed a petition for writ of habeas corpus with the United States District Court for the Middle District of Florida, which was denied. *Taylor v. Sec'y, Fla. Dept. of Corr.* (*Taylor IV*), No. 8:10-cv-382-T-30AEP, 2011 WL 2160341, at *65 (M.D. Fla. June 1, 2011). In addition to other claims, Taylor contended that as a result of *Brady* and *Giglio* violations, as well as ineffective assistance of counsel, he was wrongfully convicted of sexual battery. *Id.* at *19. According to Taylor, because of this error, he was wrongfully convicted of felony murder, and the trial court erroneously found the aggravating factor that the murder was committed during a sexual battery. *Id.* As part of this claim, Taylor contended that Dr. Miller recanted his trial testimony that Birch's genital injuries were inconsistent with being inflicted by a kick. *Id.* at 20. The federal district court comprehensively discussed both Taylor's arguments and Dr. Miller's testimony during the initial trial, the penalty phase retrial, and the postconviction evidentiary hearing. *Id.* at *26-27. It concluded that Dr. Miller did not recant his trial testimony, no evidence was suppressed by the State, and no false testimony

was given. *Id.* at \*27-28. In concluding that Dr. Miller's postconviction testimony had not changed from his trial testimony, the federal district court explained:

> Dr. Miller did not testify at the evidentiary hearing that it was his opinion within a reasonable degree of medical probability that the injuries to the victim's genital area were caused by a kick. *Instead, he stated that the injuries possibly could have been caused by a kick if the shoe had actually entered the vaginal canal, which he stated was "a one-in-a-million shot."* That testimony is not inconsistent with his trial testimony that within a reasonable degree of medical probability the interior injuries were caused by something inserted into the vagina, and that those injuries were not consistent with having been inflicted by someone kicking the victim in that area.

*Id.* at \*27 (emphasis added).

The federal district court again referenced Dr. Miller's "one-in-a-million shot" testimony when it concluded that Taylor had failed to satisfy the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984), where Taylor claimed trial counsel was ineffective for failing to retain an independent pathologist to assist the defense:

> [T]o satisfy the prejudice prong under *Strickland*, Taylor must establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* 466 U.S. at 694. At the post-conviction hearing, Dr. Miller admitted that it was possible that the injuries to the victim's genital area were caused by a kick if the toe of the shoe penetrated the victim's vaginal area. *He stated, however, that such a kick would be a "one[-]in-a-million shot."* [State postconviction expert] Dr. Lynch's [sic] testified at the evidentiary hearing that penetration caused the injuries to the victim's vagina, and that she did not believe a kick could have caused the injuries unless the foot was able to fit into the vagina. She testified that it was unlikely that Taylor's shoes would have been able to fit into the victim's vagina. Thus, her testimony

supported Dr. Miller's opinion.  In light of Dr. Miller and Dr. Lynch's testimony during the post-conviction hearings regarding the cause of the injuries to the victim's genital area, Taylor has not established a reasonable probability that had counsel obtained a forensic pathologist to testify at trial, the result of the trial would have been different.

*Taylor IV*, 2011 WL 2160341, at *34 (emphasis added).

On July 14, 2016, Taylor filed a successive motion for postconviction relief, which is the subject of the present case.  Attached to the motion was an affidavit signed by Dr. Miller (the Miller affidavit) in which he stated:

> On June 7, 2004, I testified at Mr. Taylor's postconviction evidentiary hearing.  I expressed my opinion that it was reasonably possible, perhaps probable, that the internal genital injuries were caused by the penetration of the toe of a shoe.  I commented that this was a one-in-a-million shot.
> This was an unfortunate choice of words and I regret it.  A "one in a million" shot implies near impossibility and in this case this is not true.  I can only reiterate my previous testimony that Dr. Wright's interpretation of these injuries having been caused by a kick and not by an object having been deliberately inserted into the vagina is a very reasonable possibility.

In his motion, Taylor contended that the alleged misinterpretation of Dr. Miller's "one-in-a-million shot" comment led the postconviction court and subsequent courts to reject any claim that Dr. Miller's opinion had changed, and that the evidence of sexual battery had been negated.  Taylor stated that the Miller affidavit was not previously available because Dr. Miller "was not aware of the incorrect interpretation of his testimony and therefore was unaware of the need to come

- 10 -

forward to correct the errors." Taylor asserted that he was unable to contact Dr. Miller until June 2015.

Taylor presented the following claims in his successive motion: (1) the Miller affidavit is newly discovered evidence that undermines the courts' rejection of Dr. Miller's postconviction testimony that Birch's injuries were caused by a kick; (2) the Miller affidavit demonstrates that trial counsel was ineffective for failing to elicit testimony from Dr. Miller that a likely cause of Birch's internal genital injuries was a kick, and for failing to retain a forensic pathologist who could make the correct determination of causation; (3) the State violated *Brady* and *Giglio* by failing to notify the defense that Dr. Miller believed Birch's internal genital injuries supported a theory of innocence of sexual battery; and (4) Taylor's death sentence violates *Hurst v. Florida* (*Hurst v. Florida*), 136 S. Ct. 616 (2016).

On October 7, 2016, the postconviction court summarily denied claims one through three. The court reserved ruling on claim four on the basis that this Court's determination of the retroactivity of *Hurst v. Florida* was critical to resolution of the claim. On February 8, 2017, the postconviction court granted Taylor's motion to amend claim four to add claims based upon *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017).[4]

---

4. However, the postconviction court denied a second motion to amend to add a fifth claim that the enactment of chapter 2017-1, Laws of Florida, which

Taylor filed a witness/exhibit list, naming as a witness Dr. Harvey Moore, Ph.D. The exhibit list included a content analysis evaluation conducted by Dr. Moore which concluded that "[b]ased on the socio-legal standard established in *Caldwell v. Mississippi, 472 U.S. 320 (1985)* we may conclude to a reasonable degree of sociological certainty the jury which recommended a sentence of death for Mr. Taylor in [*Taylor II*] was persuaded against the requisite level of attention to its responsibility through comments made by the court and prosecutor, and repeated by fellow members of the venire." Taylor intended to present Dr. Moore and introduce the exhibits "to lend evidentiary support for arguments against the current June 24, 2002 *Hurst* cutoff date,[5] and in support of retroactivity under the fundamental fairness doctrine." The State filed a motion to strike Dr. Moore as a witness and the exhibits. On June 12, 2017, the postconviction court granted the State's motion and summarily denied amended claim four of Taylor's successive motion.

This appeal follows.

---

precludes imposition of the death penalty unless the jury unanimously recommends death, created a substantive right that must be retroactively applied.

5. June 24, 2002, is the date the United States Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002). In *Asay v. State*, 210 So. 3d 1, 22 (Fla. 2016), *cert. denied*, 138 S. Ct. 41 (2017), we held that *Hurst* does not apply retroactively to defendants whose death sentences became final prior to the issuance of *Ring*.

## ANALYSIS

### *Newly Discovered Evidence*

Taylor first asserts that the Miller affidavit constitutes newly discovered evidence of his innocence of sexual battery because it demonstrates that the cause of Birch's internal genital injuries was a kick. He argues that because of Dr. Miller's "one-in-a-million shot" comment during the postconviction evidentiary hearing, the state courts have refused to recognize that Dr. Miller's opinion has changed, and the federal district court endorsed the state courts' refusal to recognize the shift in opinion. This claim is both untimely and without merit.

With respect to timeliness, Florida Rule of Criminal Procedure 3.851 provides that a motion for postconviction relief must be filed within one year after the judgment and sentence become final unless "the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence." Fla. R. Crim. P. 3.851(d)(2)(A). The first alleged misinterpretation of Dr. Miller's testimony occurred on February 1, 2006, when the postconvicton court stated in its denial order, "Dr. Miller concluded that the chances of the victim's vaginal injuries coming from a kick were kind of a one-in-a-million shot." Counsel for Taylor would have been aware of this statement at that time, and accordingly, any challenge based upon the postconviction court's interpretation of Dr. Miller's

testimony was required to have been filed within one year of that date. Because more than ten years elapsed between this statement by the postconviction court and the filing of the successive motion on July 14, 2016, Taylor's motion is untimely. Further, even though this Court in 2009 and the federal district court in 2011 later stated that the chance that Birch's internal genital injuries were caused by a kick was "one in a million," *Taylor III*, 3 So. 3d at 993, 996; *Taylor IV*, 2011 WL 2160341, at *27, *34, these repetitions of Dr. Miller's testimony do not commence a new one-year period for filing a successive motion.

With regard to the merits of Taylor's claim, the Miller affidavit does not constitute newly discovered evidence because nothing in the affidavit is materially different from Dr. Miller's postconviction evidentiary hearing testimony. During the hearing, Dr. Miller testified that Birch's internal genital injuries were caused by penetration. He further testified that if, as the result of a kick, the toe of a shoe entered the vaginal canal, stretch injuries consistent with those sustained by Birch could result. However, Dr. Miller also stated that the likelihood of a kick hitting the genital area where it would enter the vaginal canal was a "one-in-a-million shot." Taylor's postconviction counsel sought clarification of this precise statement, to which Dr. Miller replied, "Well, it's you can kick somebody an awful lot in that area and not have your toe actually go up into that narrow vaginal canal." Although the Miller affidavit reflects that Dr. Miller now regrets his choice

- 14 -

of words, this does not change the fact that Dr. Miller believed the likelihood of the toe of a shoe entering the vaginal canal as the result of a kick was very slim. Therefore, the chance that the internal genital injuries were caused by a kick remains slim.

Stated differently, if—against significant odds—the toe of Taylor's shoe did penetrate Birch's vagina, then Dr. Miller agreed with Dr. Wright that it is possible, maybe even probable, that her internal genital injuries were caused by a kick. However, based upon Dr. Miller's testimony, the chance of the shoe making contact in such a way was so unlikely, it was—to use Dr. Miller's exact words—a "one-in-a-million shot." The fact that Dr. Miller could have, and if given another opportunity would have, phrased his observation differently does not alter the conclusion reached by the postconviction court and this Court that the chance Birch's internal genital injuries were caused by a kick was "one in a million" because this was the phrasing Dr. Miller used to convey the unlikely odds. Further, this is not inconsistent with the Miller affidavit, which states:

> I can only reiterate my previous testimony that Dr. Wright's interpretation of these injuries having been caused by a kick and not by an object having been deliberately inserted into the vagina is a very reasonable possibility.

Nor is it inconsistent with Dr. Miller's trial testimony that Birch's internal genital injuries, within a reasonable degree of medical probability, (1) could have been caused by a hand or other object, (2) were not consistent with her having been

kicked in that area, and (3) were the result of penetration. Based upon the foregoing, the Miller affidavit is not newly discovered evidence.

*Ineffective Assistance of Trial Counsel*

Taylor next asserts that trial counsel was ineffective for failing to elicit testimony from Dr. Miller that a likely cause of Birch's injuries was a kick, and for failing to retain a forensic expert to make the correct determination of causation. Because the Miller affidavit does not constitute newly discovered evidence, these claims are both successive and without merit. The same claims were raised in both *Taylor III* and *Taylor IV* and were rejected. *See* 3 So. 3d at 996; 2011 WL 2160341, at *32-34.

*Hurst-Related Claims*

Taylor raises a number of challenges to his death sentence based upon *Hurst v. Florida* and *Hurst*. Most of these arguments were rejected in *Hitchcock v. State*, 226 So. 3d 216 (Fla.), *cert. denied*, 138 S. Ct. 513 (2017), and do not warrant discussion. To the extent Taylor challenges the postconviction court's refusal to permit Dr. Moore to testify with respect to the content analysis he conducted, this challenge turns on whether *Hurst* should be made retroactive to the date of the decision in *Caldwell*. However, in *Hitchcock*, we explained that *Hurst* does not apply retroactively to death sentences that became final prior to the issuance of *Ring* based upon our earlier decision in *Asay v. State*, 210 So. 3d 1 (Fla. 2016).

*See Hitchcock*, 226 So. 3d at 217. Because Taylor's sentence became final in 1994, *Hurst* does not apply to him, and we decline to extend the retroactivity of *Hurst* to the date of *Caldwell*. Moreover, in *Reynolds v. State*, 43 Fla. L. Weekly S163, S167 (Fla. Apr. 5, 2018) (plurality opinion), we concluded that pre-*Ring Hurst*-induced *Caldwell* challenges are without merit.

Finally, in *Asay v. State*, 224 So. 3d 695, 703 (Fla. 2017), and *Lambrix v. State*, 227 So. 3d 112, 113 (Fla.), *cert. denied*, 138 S. Ct. 312 (2017), we rejected as without merit the claim that chapter 2017-1, Laws of Florida, created a substantive right that must be retroactively applied. Accordingly, the postconviction court did not abuse its discretion when it denied Taylor's second request to amend his successive motion to add this claim.

## CONCLUSION

Based upon the foregoing, we affirm the summary denial of Taylor's successive motion for postconviction relief.

It is so ordered.

LABARGA, C.J., and LAWSON, J., concur.
CANADY, J., concurs specially with an opinion, in which POLSTON, J., concurs.
PARIENTE, J., concurs in result with an opinion.
LEWIS, J., concurs in result with an opinion.
QUINCE, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, J., specially concurring.

I concur in the denial of Taylor's newly discovered evidence claim and ineffective assistance of trial counsel claims. I also agree that Taylor is not entitled to postconviction relief on his *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016)-related claims and that the successive motion for postconviction relief should therefore be denied. But I would not rely on *Hurst v. State* and its progeny. Instead, I would deny the *Hurst*-related claims on two grounds. First, no *Hurst v. Florida* error occurred in this case because the aggravating factor that the capital felony occurred during the commission of a sexual battery was established by the sexual battery conviction. *See Hurst v. State*, 202 So. 3d at 77-83 (Canady, J., dissenting).[6] Second, in any event *Hurst v. Florida* should not be given retroactive application. *See Mosley v. State*, 209 So. 3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part).

POLSTON, J., concurs.

PARIENTE, J., concurring in result.

Taylor was sentenced to death based on a jury's nonunanimous

---

6. The requirement of *Hurst v. Florida* that the jury find an aggravator was also satisfied by the existence of the prior violent felony aggravator, which was established by Taylor's conviction "for sexual battery in 1982." *See Taylor v. State*, 3 So. 3d 986, 999 (Fla. 2009).

recommendation for death by a vote of eight to four. *Taylor v. State*, 638 So. 2d 30, 31 (Fla. 1994). To not apply *Hurst*[7] in Taylor's case results in Taylor being sentenced to death under an unconstitutional sentencing scheme. As I explained in *Asay V*:[8]

> I conclude that *Hurst* should apply to all defendants who were sentenced to death under Florida's prior, unconstitutional capital sentencing scheme. The majority's [retroactivity] conclusion results in an unintended arbitrariness as to who receives relief depending on when the defendant was sentenced or, in some cases, resentenced. For example, many defendants whose crimes were committed before 2002 will receive the benefit of *Hurst* because they were previously granted a resentencing on other grounds and their newest death sentence was not final when *Ring* was decided. To avoid such arbitrariness and to ensure uniformity and fundamental fairness in Florida's capital sentencing, our opinion in *Hurst* should be applied retroactively to all death sentences.

210 So. 3d at 36 (Pariente, J., concurring in part and dissenting in part) (footnote omitted).

---

7. *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016).

8. *Asay v. State* (*Asay V*), 210 So. 3d 1 (Fla. 2016), *cert. denied*, 138 S. Ct. 41 (2017); *see Hitchcock v. State*, 226 So. 3d 216, 220-23 (Fla.) (Pariente, J., dissenting), *cert. denied*, 138 S. Ct. 513 (2017).

I also note that on direct appeal in 1993, Taylor, like other defendants sentenced to death before *Ring v. Arizona*, 536 U.S. 584 (2002),[9] argued that Florida's capital sentencing statute was unconstitutional, stating:

> To the extent that Florida's death penalty scheme allows a death recommendation, which has a crucial and often dispositive impact on the resulting death sentence, to be returned by a bare majority vote of the jury, it violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
> Not only does the Florida procedure fail to require jury unanimity . . . to return a death recommendation; it also fails to require unanimous . . . agreement as to whether a particular aggravating circumstance has been proven beyond a reasonable doubt, or even as to whether *any* aggravating circumstance has been proven beyond a reasonable doubt. The United States Supreme Court has repeatedly recognized that the Eighth and Fourteenth Amendments require a heightened degree of reliability when a death sentence is imposed. Florida's capital sentencing scheme . . . works in the opposite direction.

Initial Br. of Appellant, *Taylor v. State*, No. 80,121 (Fla. July 6, 1993), at 33-34 (footnote omitted) (citations omitted). Of course, we have now determined that the United States and Florida Constitutions require that these precise findings be made by a unanimous jury before a death sentence can be imposed. *Hurst*, 202 So. 3d at 44. As I stated in *Hurst*: "If 'death is different,' as this Court and the United States Supreme Court have repeatedly pronounced, then requiring unanimity in the jury's final recommendation of life or death is an essential prerequisite to the continued

---

9. *See, e.g.*, *Gaskin v. State*, 218 So. 3d 399, 401-05 (Fla.) (Pariente, J., concurring in part and dissenting in part), *cert. denied*, 138 S. Ct. 471 (2017).

- 20 -

constitutionality of the death penalty in this State." 202 So. 3d at 70 (Pariente, J., concurring) (footnote omitted) (quoting *Yacob v. State*, 136 So. 3d 539, 546 (Fla. 2014)).

Applying *Hurst* in this case, I would grant Taylor a new penalty phase based on the jury's nonunanimous recommendation for death. *See Mosley v. State*, 209 So. 3d 1248, 1284 (Fla. 2016); *see also Reynolds v. State*, 43 Fla. L. Weekly S163, S169-71 (Fla. Apr. 5, 2018) (Pariente, J., dissenting). Nevertheless, recognizing that I am bound by this Court's opinions in *Asay V* and *Hitchcock,* which are final, I concur in result.

LEWIS, J., concurring in result.

I have repeatedly expressed my disagreement with this Court's *Hurst* retroactivity determinations,[10] and I do so again today. I recognize that the majority simply applies prior precedent but I again urge that we follow proper legal theory. I believe that defendants who properly preserved the substance of a *Ring*[11] challenge at trial and on direct appeal prior to that principle of law having a case

---

10. *See State v. Silvia*, 235 So. 3d 349, 352, 356-57 (Fla. 2018) (Lewis, J., dissenting); *Hitchcock v. State*, 226 So. 3d 216, 218-20 (Fla.) (Lewis, J., concurring in result), *cert. denied*, 138 S. Ct. 513 (2017); *Asay v. State*, 210 So. 3d 1, 30-31 (Fla. 2016) (Lewis, J., concurring in result), *cert. denied*, 138 S. Ct. 41 (2017).

11. *Ring v. Arizona*, 536 U.S. 584 (2002).

name should also be entitled to have their constitutional challenges heard.  Today the Court again looks the other way and denies relief to a pre-*Ring* defendant who raised—and thus preserved—a substantive *Ring* claim before it was so named.  *See Taylor v. State*, 638 So. 2d 30, 33 n.4 (Fla. 1994).  For this reason, I dissent as to the *Hurst* retroactivity issue.

Preservation is perhaps the most basic tenet of appellate review, *see Steinhorst v. State*, 412 So. 2d 332, 338 (Fla. 1982); and this Court should be particularly cognizant of preservation issues for capital defendants.  Accordingly, the fact that some defendants specifically cited the name *Ring* while others did not is not dispositive, in my view.  Rather, the proper inquiry centers on whether a defendant preserved his or her substantive constitutional claim to which and for which *Hurst* applies.[12]  This preservation approach—enshrined in *James v. State*, 615 So. 2d 668 (Fla. 1993)—ameliorates some of the majority's concern with the effect on the administration of justice.  Defendants who did not properly preserve their constitutional challenges—through trial and direct appeal—forfeited them just as any other defendant who fails to raise and preserve a claim.  However, those defendants who, like Taylor, challenged Florida's unconstitutional sentencing

---

12. *See* L. Anita Richardson & Leonard B. Mandell, *Fairness Over Fortuity: Retroactivity Revisited and Revised*, 1989 Utah L. Rev. 11, 56-57 (1989).

- 22 -

scheme based on the substantive matters addressed in *Hurst* are entitled to consideration of that constitutional challenge.

Jurists have echoed this type of approach as a remedy to the more exacting federal *Teague*[13] standard.[14]  Federal courts have employed a similar preservation approach, and it is "one of the dominant means by which federal courts limit the disruptive effects of legal change in the context of direct review of federal criminal convictions."[15]  Regardless of the limited federal approach, scholars urge state courts to pull retroactivity off *Teague*'s constitutional floor,[16] which the United States Supreme Court expressly permitted in *Danforth v. Minnesota*, 552 U.S. 264, 280 (2008).

---

13.  *Teague v. Lane*, 489 U.S. 288 (1989).

14.  Tung Yin, *A Better Mousetrap: Procedural Default as a Retroactivity Alternative to* Teague v. Lane *and the Antiterrorism and Effective Death Penalty Act of 1996*, 25 Am. J. Crim. L. 203, 232 (1998).

15.  Toby J. Heytens, *Managing Transitional Moments in Criminal Cases*, 115 Yale L.J. 922, 942 (2006).

16.  Christopher N. Lasch, *The Future of* Teague *Retroactivity, or "Redressability," After* Danforth v. Minnesota*: Why Lower Courts Should Give Retroactive Effect to New Constitutional Rules of Criminal Procedure in Postconviction Proceedings*, 46 Am. Crim. L. Rev. 1, 51-54 (2009).

This Court's adoption of the *Stovall*[17]/*Linkletter*[18] standard was intended to provide "more expansive retroactivity standards" than those of *Teague*. *Johnson v. State*, 904 So. 2d 400, 409 (Fla. 2005). However, the Court's retroactivity decision post-*Hurst* eschews that intention. Further, it illuminates Justice Harlan's famous critique of *Linkletter*:

> Simply fishing one case from the stream of appellate review . . . and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from this model of judicial review.

*Williams v. United States*, 401 U.S. 646, 679 (1971) (Harlan, J., concurring in part and dissenting in part). However, that is how the majority of this Court draws its determinative, albeit arbitrary, line. As a result, Florida will treat similarly situated defendants differently—here, the difference between life and death—for potentially the simple reason of one defendant's docket delay. Vindication of these constitutional rights cannot be reduced to either fatal or fortuitous accidents of timing.[19]

Every pre-*Ring* defendant has been found by a jury to have wrongfully murdered his or her victim. There may be defendants that properly preserved

---

17. *Stovall v. Denno*, 388 U.S. 293, 297 (1967).

18. *Linkletter v. Walker*, 381 U.S. 618, 636 (1965).

19. *See generally* Christopher M. Smith, Note, Schriro v. Summerlin*: A Fatal Accident of Timing*, 54 DePaul L. Rev. 1325 (2005).

challenges to their unconstitutional sentences through trial and direct appeal, but this Court nonetheless chooses to limit the application of *Hurst*, which may result in the State wrongfully executing those defendants. It seems axiomatic that "two wrongs don't make a right"; yet this Court essentially condones that outcome with its very limited interpretation of *Hurst*'s retroactivity and application.

For the reasons discussed above, I continue to respectfully dissent on the *Hurst* issue.

An Appeal from the Circuit Court in and for Hillsborough County,
    Michelle Sisco, Judge - Case No. 291988CF015525000AHC

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, James L. Driscoll, Jr., David Dixon Hendry, and Gregory W. Brown, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and C. Suzanne Bechard, Assistant Attorney General, Tampa, Florida,

    for Appellee